IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

STEFFON L. DAVIS,

     Plaintiff,

       v.

EGG HARBOR TOWNSHIP, et al.,

     Defendants.

Civil No. 14-4213 (RMB/AMD)

**OPINION**

**David R. Castellani, Esq.**
Castellani Law Firm, LLC
450 Tilton Rd.
Suite 245
Northfield, NJ 08225
    *Attorney for Plaintiff*

**Thomas B. Reynolds, Esq.**
Reynolds & Horn, P.C.
750 Route 73 South
Suite 202 A
Marlton, NJ 08053
    *Attorney for Defendants*

**BUMB**, United States District Judge:

THIS MATTER comes before the Court upon the filing of a Motion for Summary Judgment by Defendants Egg Harbor Township, Patrolman Bertino, Patrolman Mensch, Patrolman London, and Sergeant Super. (Not. Mot. [ECF No. 26]). For the reasons set forth below, the Court will GRANT IN PART Defendants' Motion and DENY IN PART Defendants' Motion.

## I.  __FACTUAL BACKGROUND__

The case arises from an altercation which occurred a few minutes after one o'clock in the morning on July 6, 2012, when Defendant Patrolman Bertino ("Patrolman Bertino") conducted a traffic stop of Plaintiff Steffon Davis (the "Plaintiff") and Plaintiff refused to obey several officers' commands to exit his car.  (Def.'s Mot. Summ. J. Ex. J, at 1 ("Dashcam Tr.") [ECF No. 26.]).  Patrolman Bertino made the traffic stop in response to a call from another motorist who claimed Plaintiff was chasing the motorist at a high rate of speed and following too closely. (Defs.' Statement of Facts [ECF No. 26-5] & Pl.'s Resps. [ECF No. 35] ("DSOF & PR") ¶ 177).  As testified to by Sergeant Super, the substance of which Plaintiff does not contest: "the dispatcher advised us that he had two subjects on the phone saying they were being chased by a subject — an unknown subject — in a vehicle." (See Def.'s Mot. Summ. J. Ex. F ("Super Dep."), at 98:10-17). Sergeant Super further testified he "recall[ed] or driving north on Tremont Avenue.  A vehicle passed by me, later being identified as the complainants['] or the victims['], and the next vehicle coming — driving by me at a high rate of speed was Mr. Davis' vehicle.  As I slowed down, I saw Officer Bertino's vehicle going in the same direction as Mr. Davis'.  I turned around.  I saw that Officer Bertino had activated his overheads and was pulling over Mr. Davis' car.  And I don't recall if I advised him or not that I was going to go get — stop and talk

2

to the complainant. So, I just continued on, and I stopped the complainant's vehicle about a quarter mile down the road" from where Patrolman Bertino had pulled over the Plaintiff. Id. 98:25-99:14.

According to the transcript of the dashboard-mounted camera on the responding police car, Patrolmen Bertino and Super exchanged information via their radios. (Dashcam Tr. at 2:21-3:3). Plaintiff admitted he had been following the motorist, however he explained that he was doing so because he believed friends were in the car, and he was trying to catch up to them to socialize. According to the dashcam recording, Officer Bertino can be heard questioning Davis about why he was following the car in front of him, which the police had also stopped. At first, Davis told the officer that one of his "buddies" by the name "Sam" was in the car, but he did not know his last name. (Id. 2:3-5). When Officer Bertino advised Davis that there was no "Sam" in the car – presumably learning that fact from Sergeant Super - Davis replied "they must have dropped him off." (Id. 3:6-7). Referring to the direction the cars had travelled, Officer Bertino then asked "So why make a big circle? It doesn't make any sense." (Id. 4:7-8). From the questioning caught on the recording, it is clear that Officer Bertino did not believe – understandably – Plaintiff's version of the facts.

In sum, throughout the traffic stop, Patrolman Bertino continued to ask Plaintiff questions about why he had been following the other vehicle, and Plaintiff continued to insist he knew the occupants in the vehicle, although, as mentioned, he gave several names of individuals who were not in the car. (Dashcam Tr. at 6:3-8:14). Patrolman Bertino also asked Plaintiff if he had anything he was "not supposed to have inside th[e] vehicle," which Plaintiff denied. (Id. at 8:15-19). After this, Patrolman Bertino asked Patrolman Mensch, who was positioned on the other side of the vehicle, "do you smell anything?" (Dashcam Tr. at 9:5). Patrolman Mensch can then be seen on the video of the traffic stop leaning his head into the passenger side window, but he did not give an audible response to Patrolman Bertino. (Pl.'s Opp. Summ. J. Ex. B ("Dashcam Video") at 1:17:10-1:17:15).[1] Both Patrolmen Mensch and Bertino later testified that they smelled marijuana. (Def.'s Mot. Summ. J. Ex. H ("Bertino Dep."), at 26:11; Def.'s Mot. Summ. J. Ex. I ("Mensch Dep."), at 19:25-20:1). Plaintiff denied that they could smell anything. (Def.'s Mot. Summ. J. Ex. B ("Davis Dep."), at 122:23-123:1; Dashcam Tr. 9:6-10).

Thereafter, Patrolman Bertino ordered Plaintiff to "[s]tep out of the vehicle." (Dashcam Tr. 9:16-22, 10:17-18).

---

[1] Citations to the Dashcam Video are given based on the timestamp in the recording.

Plaintiff refused, stating, "For what?  I don't have to step out of the vehicle.  I have the credentials."  (Id. at 10:19-21). Patrolman Bertino ordered Plaintiff to step out of the vehicle twice more, and Plaintiff refused twice more.  (Id. at 11:1-7). Patrolman Mensch then asked twice, "Do you want to get arrested for obstruction?" as he circled around to the driver's side of the vehicle, next to Patrolman Bertino.  (Id. at 11:11-12; Dashcam Video at 1:18:10-1:18:18.)  Plaintiff was then ordered twice to shut off his car, and was also asked if he wanted "to get pepper sprayed."  (Dashcam Tr. 12:2-3.)  Patrolman Bertino then ordered Plaintiff to "unlock the car right now and get out," after which the officers can be seen reaching into the car and apparently attempting to unlock or open the driver-side door.  (Id. at 12:7-8; Dashcam Video at 1:18:50-1:19:02).

All this time, Plaintiff refused to get out of the car and disputed that the officers were even allowed to reach into the vehicle.  (Id. 12:9-12 ("I don't have to get out, Sir.  You are not allowed to reach in my car, Sir.  Why are you touching me?")).  Plaintiff was also ordered to shut the car off, which he refused to do.  As can be clearly heard in the recording, Plaintiff was advised by Officer Bertino that he was under arrest and to get out of the car.  (Dashcam Tr. at 12:21-22.) Several officers yelled for Davis to get out of the car, yet Davis remained noncompliant.  Davis yelled back that the cops

were "beating" him, although the video clearly captures that at times the officers were not even near the car or Plaintiff as he yelled he was being beaten.

At some point, Patrolman Mensch deployed pepper spray against Plaintiff. (Defs.' Mot. Summ. J. Ex. I ("Mensch Dep."), at 23:6-14). The recording is clear that Davis was not pepper sprayed until he refused to get out of the car and he was asked whether he wanted to get pepper sprayed. Patrolman Mensch testified to spraying Plaintiff "four or five times" throughout the encounter. (Id. 18:13-16). The exact distance at which the spray was deployed and when and why the deployments occurred are in dispute. The officers were eventually able to reach into the car and unlock and open the driver's side door of the vehicle. (Dashcam Tr. at 13:6). (During this time, Plaintiff continued to speak hands-free with someone on a cellphone.) The footage of the incident appears to show that with the car door now open, Patrolman Mensch brought his police canine to the driver-side door and allowed the dog's head into the driver-side door opening, but the canine appears to remain outside the car. (Dashcam Video at 1:20:00-1:21:48).[2] When Plaintiff did not respond to the canine, one of the officers tried to physically

---

[2] It is around this time during the incident that another police car parked across the street from the incident and produced a glare from its emergency lights that obscures the remainder of the video.

pull Plaintiff out of the car.  (Id. at 1:21:27).  Again,
Plaintiff can be heard talking to someone on his phone –
apparently – and yelling that he was being beaten up, although
it is clear there are no officers even near him at times when he
is screaming that he was being beaten.  While the officers were
struggling to remove Plaintiff from the car, Patrolman Mensch,
standing several feet away from the vehicle, drew his gun and,
pointing at Plaintiff, said "I am going to shoot you." (Id.
1:20:05; Mensch Dep. at 27:23:25 ("**Q.** All right.  Do you recall
indicating to Mr. Davis that you were going to shoot him?  **A.**
Yes.").

What was happening inside the car this whole time is
disputed.  Officer London testified that during the altercation
in the car, Plaintiff "reached underneath th[e] seat no less
than 10 times and after he would disengage he'd reach back[.]"
(Defs.' Mot. Summ. J. Ex. G ("London Dep."), at 20:24–21:2).
London testified that he was "fairly certain there was a weapon
underneath th[e] seat and [Plaintiff] was trying to get it to
utilize it."  Id. at 21:2-5.  Similarly, Officer Bertino
testified that he could not see Plaintiff's right hand because
"he was either holding on to the center console, so his hand was
out of view – or he was reaching back behind the passenger's
seat, so at any given point he was holding on to something to
prevent me from getting out of the vehicle."  (Bertino Dep. at

41:13-19).  Officer Mensch testified he used the canine as a

deterrent effect because Plaintiff "was actively resisting

arrest and we were unsure if he was armed or not.  He kept

reaching underneath his seat and we had no idea what he was

reaching for."  (Mensch Dep. 16:23-25).  Officer Mensch further

testified that he pepper sprayed Plaintiff four or five times

because "it didn't have the desired effect on him and he still

wasn't listening to our commands."  (Id. at 18:13-16).  Finally,

Officer Mensch testified that he told Plaintiff he was going to

shoot him as "constructive authority," meaning he "had reason to

believe that [he] might have to shoot [Plaintiff] because [he]

thought he was going to pull a gun out."  (Id. at 30:3-7).

Against the officers' consistent (and largely corroborated)

testimony, Plaintiff denies that he reached for something, other

than his phone or credentials.  He does admit, however, that he

had 44 grams of marijuana and a digital scale in the car along

with approximately $2,000 in cash.  He also testified that he

was pepper sprayed five times and Officer Mensch pointed a gun

at him.  Finally, Plaintiff testified that the dog "was on

[him]," a fact not at all corroborated by the video.  Ex. B, at

20.

     After being removed from the car, Plaintiff complained that

his leg was injured, he was in pain, and repeatedly asked for an

ambulance.  (Dashcam Video at 1:23:52).  An ambulance was

called, and during a time period after Plaintiff appears to have been apprehended, the police officers continued to ask Plaintiff questions about his story. After being read his rights, an unidentified officer asked Plaintiff if he could search his vehicle, to which Plaintiff responded that the car was his wife's vehicle and that, either way, they could not search the vehicle. (Dashcam Video at 1:28:07-1:28:38; Dashcam Tr. at 20:20-22:3). Asked if there was a reason a narcotics dog would find anything in the car, Plaintiff reiterated after a pause that he needed an ambulance. (Dashcam Video 1:28:48-1:28:54).

At some point after Plaintiff's removal from the car, Patrolman London searched Plaintiff's car and grabbed a "fanny pack" which was observed through the side rear door lying underneath the rear portion of the passenger's side front seat. (Defs.' Mot. Summ. J. Ex. G ("London Dep."), at 18:16-24). Once removed from the vehicle, Patrolman London testified that the bag must have been partially opened, because he was able to observe "a scale and leafy vegetation packed in plastic bags." (Id. at 18:22-19:4). Patrolman London showed this to Sergeant Super, who then advised him to "put it back in the car and close the door," which he did. (Id. at 19:10-11). London testified that he conducted this search on the grounds of "community caretaking," because he was suspicious that the car "had a gun inside of it" and was going to be released back to Plaintiff's

mother. (Id. at 21:12-15). London stated that he "never smelled any marijuana," nor did Patrolmen Bertino or Mensch communicate to him that they had smelled marijuana. (Id. at 23:10-11).

Plaintiff was brought to Shore Medical Center where he was examined and diagnosed with a "left ankle sprain." (Defs.' Mot. Summ. J. Ex. Q ("Medical Records"), at 3). Tests found that Plaintiff's ankle had "[n]o acute fracture. No joint space abnormality . . . Mild soft tissue swelling." Id. at 6.

Plaintiff was ultimately charged with "obstruction, resisting arrest, aggravated assault, and possession of CDS with intent to distribute." (Defs.' Mot. Summ. J. Ex. K ("Superior Court Indictment"), at 3:7-9). Plaintiff and the state reached a plea agreement, whereby Plaintiff pled guilty to "the fourth degree crime of obstructing the administration of law." (DSOF & PR ¶¶ 303-04). This guilty plea required Plaintiff to make factual admissions that he refused to get out of his vehicle or roll down his window when asked by police to do so. Id. at ¶ 305. In October 2013, the state court granted Plaintiff a civil reservation on the charge, as part of his plea agreement. (Def.'s Mot. Summ. J. Ex. O, at 9:15).

On July 2, 2014, Plaintiff filed the instant Complaint against Egg Harbor Township, Patrolman Edward Bertino, Patrolman Mark Mensch, Patrolman Jody London, Sergeant Charles Super and

John Doe Egg Harbor Township Police Officers 1-10 (collectively, "Defendants"). (Complaint [ECF No. 1]). The Complaint alleged that Defendants violated several of Plaintiff's constitutional rights under 42 U.S.C. § 1983[3] (Count 1), that Egg Harbor Township had policies and customs that encouraged such unconstitutional behavior (Count 2), that the officers' actions constituted a variety of state law torts (Count 3), that the Defendants conspired to racially profile the plaintiff and falsely testify in order to hide their illegal actions (Count 4), that the Defendants' actions were so extreme that punitive damages should be awarded (Count 5), that the traffic stop made by Patrolman Bertino was the result of racial profiling (Count 6), and that Plaintiff should be entitled to damages (Count 7). (Compl. 7-15).

Defendants filed a motion for summary judgment on all counts on January 9, 2016. (Defs.' Mot. Summ. J. [ECF No. 26]). Plaintiff filed a brief in opposition to Defendants' Motion for Summary Judgment on February 29, 2016 but only addressed the claims of excessive force and illegal search and seizure under

---

[3] Specifically, as set forth by the Complaint in an unelaborated-upon list: freedom from unlawful search and seizure, freedom from unlawful arrest and seizure, freedom from unreasonable, unjustified and excessive force, freedom from the deprivation of liberty and property without due process of law, free from summary punishment, freedom from State created danger, and freedom from arbitrary government activity which shocks the conscience of a civilized community and society.

42 U.S.C. §1983.  (Pl.'s Opp. Summ. J. [ECF No. 35]).  After

clarification was requested by the Court, Plaintiff articulated

that it was conceding the following claims:

- The policy-based cause of action against Egg Harbor Township (Count 2)

- The state and constitutional malicious prosecution claims (Count 3)

- The racial profiling cause of action (Count 4)

(Sep. 8, 2017 Ltr. [ECF No. 39]).[4]  The Court turns to

Defendants' Motion for Summary Judgment on the remaining causes

of action.

## II.  <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R.

---

[4] Although requested by the Court to identify which causes of action "have been conceded by Plaintiff, which claims Plaintiff seeks to defend against summary judgment, and which defendants, if any, should be dismissed in light of those concessions," Plaintiff only noted its concession or defense of a subset of claims.  The Court notes that Plaintiff should have readily conceded the claims for which there was no evidence long before the Court directed him to do so, and Defendants engaged in unnecessary litigation expending unnecessary resources. Nonetheless, the Court takes Plaintiff at its word that the list of claims he seeks to defend is: "the excessive force and unlawful search and seizure claim against all individual defendants, Bertino, Mensch and London, as well as the common law assault claim."  Sep. 7, 2016 Ltr.  [ECF No. 39].  The Court construes all remaining claims to be abandoned.  This includes the conspiracy claims and any claims against Defendant Sergeant Super, although the Court does find that Plaintiff has not pointed to sufficient evidence to withstand summary judgment as to Sergeant Super as described below.

Civ. P. 56(a).  A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  Id.

When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party."  Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983).  However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial.  Anderson, 477 U.S. at 252.  Further, a court does not have to adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them.  Scott v. Harris, 550 U.S. 373, 380 (2007).  In the face of such evidence, summary judgment is still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment.").

## III. **ANALYSIS**

As best this Court can discern, Plaintiff brings three causes of action against the Defendants. Plaintiff's first cause of action is for excessive force as a result of the pepper spray and display of a firearm in violation of the Fourth Amendment. Plaintiff's second cause of action is for unreasonable search and seizure in violation of the Fourth Amendment, both as to Patrolman London's search of his vehicle and as to the length of his detention. Plaintiff's third and

final cause of action is a common law assault claim.  (Compl. at pp. 7-9; Ltr. [ECF No. 39]).[5]

## A. The *Heck* Doctrine

The Heck Doctrine precludes a plaintiff from pursuing a civil claim under 42 U.S.C. § 1983 that would directly contradict a previous holding in criminal court.  Heck v. Humphrey, 512 U.S. 477 (1994).  Recognizing that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments," the Supreme Court in Heck held that if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction . . . [the] complaint must be dismissed."  Id. at 485-87.

Nevertheless, Fourth Amendment claims under § 1983, such as claims of excessive force and unreasonable search and seizure, do not automatically "demonstrate the invalidity of [an] outstanding criminal judgment."  Id. at 487.  See also Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety Division of State Police, 411 F.3d 427, 449 (3d Cir. 2005) (holding that the court should use a fact-based inquiry to determine if a particular Fourth Amendment claim would necessarily undermine a plaintiff's outstanding conviction, based on footnote seven of

---

[5] As noted, supra, Plaintiff's complaint alleged many causes of action which were ultimately abandoned by Plaintiff at the summary judgment stage.  Pursuant to Plaintiff's concessions, as memorialized in the September 8, 2016 letter from his counsel, Plaintiff is pursuing only the three causes of action described.

Heck), overruled on other grounds by Dique v. New Jersey State
Police, 603 F.3d 181, 188 (3d Cir. 2010); Flood v. Schaefer, 367
F. App'x 315, 319 (3d Cir. 2010) (holding that Heck doctrine did
not preclude a § 1983 action because "it [was] analytically
possible for [the plaintiff] to claim that [the defendants]
subjected him to unconstitutional conditions even if a statement
he made during the same time period was voluntary").  In the
context of excessive force, this is because "law enforcement
officers can effectuate a lawful arrest in an unlawful manner."
Suarez v. City of Bayonne, 566 F. App'x 181, 185 (3d Cir. 2014)
(internal alterations and quotation marks omitted); see also
Lora Pena v. F.B.I., 529 F.3d 503, 505-506 (3d Cir. 2008) ("We
are not suggesting that [the plaintiff] will be able to recover
damages, only that the rationale of Heck does not present an
absolute bar to his [excessive force] claim.").  Likewise, in
the context of illegal searches under § 1983, such a search may
not necessarily invalidate a conviction due to "doctrines like
independent source and inevitable discovery, . . . and
especially harmless error."  Heck, 512 U.S. at 487 n.7.

Plaintiff accepted a plea agreement for "the fourth degree
crime of obstructing the administration of law."  DSOF & PR ¶
303. A person commits this offense when they obstruct "a public
servant from lawfully performing an official function."
N.J.S.A. § 2C:29-1(a).  This guilty plea required him to make

16

the factual admissions that he refused to get out of his vehicle and roll down his window when asked by police to do so.  DSOF & PR ¶ 305.

Considering <u>Heck</u>'s application to the remaining viable causes of action,[6] the <u>Heck</u> doctrine does not bar Plaintiff's claim for excessive force.  Like in <u>Nelson v. Jashurek</u>, Plaintiff's argument is that Defendants could have "effectuated a lawful arrest in an unlawful manner," by way of excessive force.  109 F.3d 142, 145 (3d Cir. 1997).  Here, Plaintiff conceded in his plea agreement that he resisted arrest.  However, he contends that the amount of force used to secure his arrest was nevertheless excessive.  <u>Id.</u> at  145.  These are not incompatible occurrences and the <u>Heck</u> doctrine therefore does not preclude Plaintiff's cause of action for excessive force.[7]

---

[6] Although Defendants purport to seek total dismissal of the Complaint under the <u>Heck</u> doctrine, their arguments largely focus on false arrest and false imprisonment, (Def.'s Br. 8), slander, (<u>id.</u>), conspiracy, (<u>id.</u>), and malicious prosecution, (<u>id.</u> at 9). Nevertheless, the Defendants' argument does speak broadly enough to reach all of Plaintiff's § 1983 causes of action, including excessive force and unlawful search and seizure.

[7] Defendants' argument relying on language from N.J.S.A. § 2C:29-1(a) is unavailing.  (Defs.' Rep. Br. 15).  Defendants rely on <u>State v. Reece</u>, 222 N.J. 154, 171 (2015) for its explanation of the phrase "lawfully performing an official function," which it describes as acting "in objective good faith, under color of law in the execution of his duties."  <u>Id.</u> (citing <u>State v. Crawley</u>, 187 N.J. 440, 460-61 (2006)).  Whether the police officers were acting lawfully in investigating Plaintiff's conduct and asking Plaintiff to step out of the car, however, is an issue unrelated to the force they subsequently applied to Plaintiff in

Likewise the legality of Patrolman London's search of Plaintiff's car subsequent to his arrest has no bearing on his criminal conviction, as all acts required to sustain the conviction – mainly Plaintiff's refusal to exit the vehicle – occurred prior to the search. (London Dep. at 18:16-24 (explaining that the search occurred as the vehicle was about to be turned back over to Plaintiff's mother on the scene). Put differently, even if the search that yielded the marijuana were invalidated or deemed unconstitutional, the offense to which Plaintiff pled guilty would not be invalidated or even implicated.

The Heck doctrine, however, does clearly bar Plaintiff's claim for unlawful search and seizure as it relates to the term of his detention. Plaintiff specifically contends that an unlawful search occurred under these circumstances: "Plaintiff submits that the request that he exit the vehicle after the call has been cleared and no criminal complaints were requested by the other vehicle was a [sic] unreasonable search and seizure." (Pl.'s Br. 15). It was these instructions which Plaintiff refused to follow that form the basis for his guilty plea for obstruction of the administration of law. In deciding whether to accept Plaintiff's guilty plea, he was asked "[w]hen they

---

effectuating his compliance with that order, as well as the associated search and seizure.

asked you to get out of your vehicle, did you refuse to get out of your vehicle?" to which Plaintiff answered affirmatively. DSOF & PR ¶ 305. Likewise, Plaintiff was asked whether he refused to roll down his window, which he also answered in the affirmative. Id. This guilty plea would be collaterally attacked by permitting a Plaintiff to go forward with a cause of action for unlawful seizure based on this conduct because the obstruction charge stemmed from the challenged portion of the stop.

Accordingly, the Court rules that Plaintiff's § 1983 claims for excessive force, unlawful search of his vehicle, and common law assault survive the application of the Heck doctrine.[8] Summary judgment is therefore improper as to these causes of action on this ground. To the extent Plaintiff claims that Bertino's order that he leave the car constituted an unlawful seizure, this claim, too, is barred by Heck, and therefore summary judgment shall be granted on that cause of action.

## B. **Excessive Force**

All of the Defendants assert that they are entitled to qualified immunity with regard to Plaintiff's cause of action for excessive force. Qualified immunity is a doctrine that

---

[8] Defendants do not discuss the common law assault claim, which does not arise under 42 U.S.C. § 1983, with respect to the Heck doctrine, although the Court notes that that claim arises from the same events as the claim for excessive force.

shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. Reichle v. Howards, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012). "In order to determine whether a government official is entitled to qualified immunity, two questions are to be asked: (1) has the plaintiff alleged or shown a violation of a constitutional right, and (2) was the right at issue 'clearly established' at the time of the defendant's alleged misconduct?" Harrison v. Atlantic City, 1:14-cv-06282-NLH-AMD, 2017 WL 2256961, at *4 (D.N.J. May 23, 2017) (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). The Supreme Court has held that courts are permitted "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis test should be assessed first." Pearson, 555 U.S. at 236.

### i. **Violation of a Right**

The Court turns first to Plaintiff's claim of excessive force and, under the qualified immunity analysis, whether the record evidence demonstrates a constitutional violation. In Graham v. Connor the Supreme Court established that all claims of constitutionally excessive force used by officers should be analyzed "under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989); Johnson v. Phila., 837 F.3d 343, 349 (3d Cir. Sep. 20, 2016) ("A claim

that a police officer used excessive force is properly analyzed

under the Fourth Amendment's 'objective reasonableness'

standard."). In determining whether or not an officer has used

excessive force, a court must examine the facts and

circumstances of each individual case, including "the severity

of the crime at issue, whether the suspect posed an immediate

threat to the safety of the officers or others, and whether the

suspect was actively resisting arrest or attempting to evade

arrest by flight. Id. at 396. In Sharrar v. Felsing, the Third

Circuit provided additional factors for consideration:

> [t]he possibility that the persons subject to the
> police action are themselves violent or dangerous, the
> duration of the action, whether the action takes place
> in the context of effecting an arrest, the possibility
> that the suspect may be armed, and the number of
> persons with whom the police officers must contend at
> one time.

Santini v. Fuentes, 795 F.3d 410, 417 (3d Cir. 2015) (citing

Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997)).

Courts are to evaluate the requisite objective

reasonableness from the perspective of the officer at the time,

and not with the benefit of hindsight. Santini, 795 F.3d at

417. This is because officers are often required to make

"split-second judgments – in circumstances that are tense,

uncertain, and rapidly evolving – about the amount of force that

is necessary in a particular situation." Graham, 490 U.S. at

396-97. Whether an officer used excessive force should

frequently remain a question for the jury.  Kopec v. Tate, 361

F.3d 772, 777 (3d Cir. 2004) (quoting Abraham v. Raso, 183 F.3d

279, 290 (3d Cir. 1999)).

First, Plaintiff contends that Patrolman Mensch's drawing

and pointing his gun at him was excessive force in violation of

the Fourth Amendment.  The pointing of a weapon can amount to

constitutionally excessive force, depending on the circumstances

of application.  Couden v. Duffy, 446 F.3d 483, 497 (3d Cir.

2006) (citing Robinson v. Solano Cnty., 278 F.3d 1007, 1015 (9th

Cir. 2002) (finding the law sufficiently established in 2002 to

recognize the "general principle that pointing a gun to the head

of an apparently unarmed suspect during an investigation" can

constitute excessive force, "especially where the individual

poses no particular danger")).  Plaintiff also contends that the

use of pepper spray constituted excessive force.  The

application of pepper spray may also potentially state a claim

for constitutionally excessive force.  Brown v. City of

Huntsville, Ala., 608 F.3d 724, 739 (11th Cir. 2010); see also

Headwaters Forest Defense v. County of Humboldt, 276 F.3d 1125,

1130 (9th  Cir. 2002) (holding that summary judgment on the use

of pepper spray was not warranted when the pepper spray was not

necessary to safely and quickly arrest plaintiffs); Park v.

Shiflett, 250 F.3d 843, 852-53 (4th Cir. 2001) (affirming the

lower court ruling that two disbursements of pepper spray from a

range of 18 inches against a clearly unarmed person who was specifically told she was not under arrest constituted excessive force).[9]

In determining the issue of qualified immunity as to each claim of a constitutional violation, the Court must view the evidence in the light most favorable to the Plaintiff. The Court turns to the pepper spray force. Regarding the severity of the crime factor, Plaintiff was pulled over for a non-violent traffic offense. This factor, viewed alone, weighs against the application of the pepper spray by Officer Mensch. As to whether Plaintiff was actively resisting arrest, Officer Mensch testified that he applied the pepper spray before Plaintiff was advised that he was under arrest. The more relevant inquiry here, however, as discussed below, is whether Plaintiff was

---

[9] Although it is unclear if Plaintiff asserts it as part of his claim, (Pl.'s Br. 14), the Court finds that Plaintiff's removal from the car by his ankle and arm to be objectively reasonable under the circumstances, given Plaintiff's abject refusal to exit the vehicle and the other circumstances confronting officers at the scene. Moreover, Plaintiff has scarcely criticized the use of canine force in this case – which appears to have had no or incidental physical contact between Plaintiff and the dog. Courts have been reticent to find the application of canine force for intimidation purposes to be unreasonable. See Navratil v. Parker, 726 F. Supp. 800, 803 (D. Colo. 1989) ("[t]he mere presence of a police dog, while intimidating, is not excessive force."); Franklin v. Borough of Carteret Police Dep't, Civ. A. No. 10-1467 (JLL), 2010 WL 4746740 (D.N.J. Nov. 15, 2010) (screening a pro se complaint and determining that, consistent with Navratil, the complaint should not proceed past screening where "the plaintiff [did not] assert that the police dog was used as any more than an instrument of intimidation.").

refusing to follow a lawful command.  Clearly, Plaintiff was refusing to so obey commands – he concedes as much.  There is no genuine dispute that Officer Mensch gave Plaintiff notice that he might get pepper sprayed if he did not comply with the officers' orders.  Indeed, Officer Mensch can clearly be heard asking Plaintiff if he wanted to get pepper sprayed, in addition to being asked if he wanted to get arrested for obstruction. This factor supports the application of pepper spray, at least initially.

As to the possibility that Plaintiff was armed or the officers had reason to believe that Plaintiff was armed, this is a fact in dispute.  Plaintiff testified that he did not reach for anything; the officers all testified, however, that they saw him reaching.  It is unclear at what point in the altercation vis-à-vis the application of the pepper spray that the officers saw Plaintiff reaching.  Relatedly, the possibility that the police officers might be in danger, thus justifying the force, is also in dispute or unclear.  The record is silent or ambiguous as to whether Plaintiff kept his hands on the wheel and whether the engine was still running.  Moreover, it is clear that Plaintiff had failed to obey the officers' orders for a considerable period of time, a factor that weighs in support of the application of pepper spray.  As for the number of persons with whom the police officers had to contend with, it was only

the Plaintiff, although it is clear that even four officers could not get Plaintiff to comply and, as such, this factor weighs in favor of the application of the pepper spray.

Finally, and perhaps most critically, is the obvious question that Plaintiff has not properly confronted:  What force would have been reasonable?  It was clear that Plaintiff was not going to abide by the officers' orders to exit the car. Plaintiff concedes as much.  Thus, the Defendants had two choices:  walk away – an unrealistic choice – or enforce compliance.  In this Court's view, considering the factors above that weigh in favor of force, the initial application of pepper spray was objectively reasonable.  Whether the subsequent applications of the pepper spray, however, constituted excessive force will depend upon a jury's resolution of the above factors that are in dispute, principally, whether the Defendants reasonably believed that Plaintiff posed a threat to their safety, or whether each subsequent application of pepper spray was necessary to get Plaintiff to comply.

Finally, Plaintiff alleges that Patrolman Mensch's brandishing his firearm and pointing it directly at Plaintiff, threatening to shoot if Plaintiff did not comply, constituted excessive force.  In this Court's view, resolution of this issue must be put to the jury.  If the jury credits the testimony that Plaintiff was reaching for something, causing Defendants to fear

for their safety, for example, the pointing of the gun might very well be objectively reasonable. Indeed, in the audio recording an officer or officers can be heard yelling that Plaintiff was reaching. Defendants consistently emphasize that the force used was not excessive because Plaintiff was reaching for what could have been a gun. (Defs.' Rep. Br. 2-4). A jury may well agree. Indeed, Defendants remark: "[I]t is undisputed that Plaintiff was reaching for something under the passenger's seat during the struggle." (Defs.' Rep. Br. 11). Plaintiff, however, has disputed this testimony.[10]

Accordingly, the excessive force claim – the successive applications of pepper spray and the brandishing of a service weapon by Patrolman Mensch survive summary judgment.[11] As such, summary judgment will be denied as to the claim of excessive

---

[10] The Court notes that it does not appear from the video that Plaintiff was even able to see the firearm. This, however, would seem to go the issue of damages, but only if the jury finds a constitutional violation and qualified immunity does not apply.

[11] This is not to say that a reasonable fact-finder will find excessive force was used. To a certain degree, Plaintiff has survived summary judgment only on the narrow path of his own testimony that he did not reach behind the seat, which is largely contradicted by all officers involved. A jury may well disbelieve Plaintiff and instead believe that he was reaching behind the seat, particularly where contraband was located there after the arrest.

force against Patrolman Mensch.[12]  Because Plaintiff has failed

to introduce any evidence that any of the other Defendants used

excessive force, summary judgment as to Plaintiff's remaining

claims of excessive force against the other officers will be

granted.  Estate of Smith v. Marasco, 430 F.3d 140, 151 (3d Cir.

2005) ("In order to prevail on a § 1983 claim against multiple

defendants, a plaintiff must show that each individual defendant

violated his constitutional rights.").

### ii. **Clearly Established Law**

The Court also holds that the second prong of the qualified

immunity analysis cannot be resolved at summary judgment as

there are facts that will need to be resolved by a jury.  The

fact that no specific case has confronted these facts is not

decisive.  See Wade v. Colaner, Civ. A. No. 06-3715 (FLW), 2010

WL 1490590, at *11 (D.N.J. Apr. 13, 2010) ("The Court need not

cite to a specific case to properly find that the law on this

point is 'clearly established.'").  As the Third Circuit has

noted:

> In the context of excessive force claims, we have
> relied on the factors set forth in Graham and Sharrar
> in evaluating whether an officer made a reasonable

---

[12] The Court does not similarly find that Patrolman London's
conduct was objectively unreasonable.  Although Patrolman London
very briefly deployed his pepper spray, he did so only once and
for a very brief period because his can immediately
malfunctioned.  On that fact alone the Court finds that no
excessive force claim survives summary judgment as to Defendant
London.

mistake. We have stated that these factors are 'well-recognized,' and that when an officer applies them in 'an unreasonable manner, he is not entitled to qualified immunity.'

Green v. New Jersey State Police, 246 Fed. Appx. 158, 162-63 (3d Cir. 2007). Here, granting all proper inferences to Plaintiff, i.e., that he was not reaching for something, the application of successive, close-range force, as testified to by Plaintiff, may constitute excessive force. See generally Wade, 2010 WL 1490590, at *10 ("[I]n such circumstances, the Court finds that it would be unreasonable for troopers to believe that Colaner's actions in striking Plaintiff and subsequently using pepper spray in response to Plaintiff's refusal to comply with Colaner's instructions to lie on the ground would not constitute excessive force."). The nature of Plaintiff's conduct in the car is central to any determination of qualified immunity.[13] Each successive application of force may have been necessary and therefore was reasonable. The Court will resolve the issue of qualified immunity by way of special interrogatories. Once these factual issues can be resolved by a jury the Court will return to the issue of qualified immunity if necessary.

---

[13] Because of the issues of fact that must be determined by a jury prior to a determination" of qualified immunity, "this decision is not an immediately appealable collateral order." Fried v. Tetzlaff, Civ. A. No. 11-cv-2578 (RMB/KMW), 2014 WL 2861098, at *7 n.9 (D.N.J. June 24, 2014).

## C. **Common Law Assault**

"In New Jersey, a person is subject to liability for the common law tort of assault if: (a) he acts intending to cause a harmful or offensive contact with the person of the other, or an imminent apprehension of such contact, and (b) the other is thereby put in such immediate apprehension." Panarello v. Vineland, 160 F. Supp. 3d 734, 767 (D.N.J. Feb. 8, 2016) (quoting Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 591 (2009)). However, "[w]here, . . . an offender offers physical resistance to arrest or to the maintenance of custody, the officer need not retreat but on the contrary may become the aggressor and use such force as is necessary to overcome resistance." State v. Williams, 29 N.J. 27, 39 (1959); Mantz v. Chain, 239 F. Supp. 2d 486, 507 (D.N.J. Dec. 30, 2002). But, "[w]here a police officer uses excessive force in effectuating an arrest, that officer may be liable for assault and battery." Hill v. Algor, 85 F. Supp. 2d 391, 411 (D.N.J. 2000). Because the issue of whether the force used by Officer Mensch was constitutionally excessive remains disputed beyond summary judgment, the Court will also deny summary judgment as to Plaintiff's claim of assault as to Patrolman Mensch, but no other Defendants.[14]

---

[14] The Court does not reach the issue of good faith immunity on this cause of action. See Matos v. City of Camden, Civ. A. No.

To the extent Defendants seek to limit pain and suffering damages as to this cause of action pursuant to N.J.S.A. § 59:9-2(D), summary judgment in Defendants' favor is warranted. That statute requires:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

N.J.S.A. § 59:9-2(D). Plaintiff has not addressed this argument and has not presented any evidence to meet the requisite evidentiary showing that his injuries fall within the statute's exception. As such, Defendant Mensch is entitled to summary judgment on this issue. See, e.g., Edwards v. N.J. Human Servs., No. CV125524MASDEA, 2016 WL 7013464, at *7 (D.N.J. Nov. 30, 2016) ("The Court, therefore, grants summary judgment in favor of Defendants on the issue of pain and suffering damages arising from Plaintiff's state law claims against Sexton, in his individual capacity.").

---

06-205 (NLH), 2009 WL 737101, at *8 (D.N.J. Mar. 18, 2009) (holding that the court could not reach the issue of good faith immunity under N.J.S.A. § 59:3-3 for the same reasons it could not resolve the issue of qualified immunity under 42 U.S.C. § 1983). Likewise, the remaining types of state-law immunity Defendants point to are inapplicable in light of the abandoned claims.

**IV. <u>UNLAWFUL SEARCH</u>**

Finally, Plaintiff has brought a claim asserting that Patrolman London violated his constitutional rights by illegally searching his car after the arrest. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable search and seizures." U.S. Const. amend IV. "Thus, a search or seizure conducted without a warrant or probable cause may form the basis of a § 1983 claim based on the Fourth Amendment." <u>Castro v. Perth Amboy Police Dept.</u>, 2014 WL 229301, at *2 (D.N.J. Jan. 21, 2014) (citing <u>Reedy v. Evanson</u>, 615 F.3d 197 (3d Cir. 2010)). Defendants offer little supporting argument to dismiss this claim other than that Patrolmen Bertino and Mensch smelled marijuana emanating from the car. It is true that the presence of marijuana or the smell of marijuana emanating from a car gives an officer probable cause to believe there is evidence of a crime to justify a search. See, e.g., <u>State v. Guerra</u>, 93 N.J. 146, 148 (1983) (holding that probable cause existed where police "detect[ed] a strong odor of raw unburned marijuana emanating" from within the car during a traffic stop). Yet, here, there is no evidence that Officer London was aware that Patrolman Bertino and Officer Mensch had smelled marijuana. In fact, Defendants do not argue that their detection of marijuana can be imputed to Patrolman London's search of the car. (London

Dep. at 19:12-19 ("No, sir.  I smelled nothing but OC spray from the moment I got on location to the time I left."); id. 21:9-15 ("After hearing Sergeant Super's conversation with [Plaintiff's] mom as soon as he was removed from the scene, the vehicle was going to be released to her and I just at the time thought that was the registered owner of the vehicle.  Not knowing who the parties were, out of community caretaking I wasn't going to let her get into a vehicle that I believe had a gun inside of it")).

Patrolman London – who testified that he was unable to smell anything on the scene but pepper spray – testified that he ultimately carried out the search because he was searching the car for a gun before the car was turned over to a relative of Plaintiff's.  (London Dep. at 21:9-15).  He called this "community caretaking."  This basis for a search was criticized by Sergeant Super, who called the search "inappropriate." (Super Dep. at 121:10).  Indeed, upon presenting the evidence on the scene to Sergeant Super, London testified that he was instructed to "put it back in the car and close the door." (London Dep. at 19:7-11).  Likewise, Defendants' expert, Steven N. Horn, called the search "impermissible."  (Defs.' Mot. Summ. J. Ex. Q (Expert Report of Steven N. Horn), at 51 (referring to London's search as "impermissible")).  Only after Patrolman London had searched the vehicle and replaced the marijuana did

Patrolman Mensch's canine give a positive alert for narcotics. (Mensch Dep. at 35:1-15).[15]

Thus, Defendants appear to concede that Officer London's search of the car was unlawful. Beyond that, Defendants do not offer any argument with regard to qualified immunity. Although Officer London testified that he believed under the "community caretaking" standard he was permitted to search the car, Defendants do not advance a qualified immunity argument here. Indeed, it appears Defendants concede there is no such basis – and so the Court need not engage in such analysis. Defendants also appear to suggest that the search would have been conducted anyway (in fact, they obtained a search warrant) and so "no harm, no foul." That may very well be true, but it does not excuse a constitutional violation. It does, however, go to Plaintiff's damages, if any, as Plaintiff can hardly be said under such circumstances to have sustained any real injury.[16]

---

[15] The Court observes that Plaintiff spends no time addressing the search of the car, perhaps recognizing that such claim is hardly disputed. Plaintiff also appears to abandon his claim relating to the length of detention.

[16] Because it appears undisputed between the parties that Plaintiff suffered no actual injury as a result of the unlawful search (indeed, Plaintiff may well have avoided being criminally charged with possession of the drugs and drug paraphernalia for this reason), a jury may find an award of nominal damages proper. See, e.g., Carey v. Piphus, 435 U.S. 247, 266 (1978). In that case, although a "prevailing party under such scenario, Plaintiff may not be entitled to an award of attorney's fees. See, Velius v. Twp. of Hamilton, 466 F. App'x 133, 140–41 (3d

Accordingly, in the record before it, the Court finds that summary judgment as to the unlawful search cause of action shall be denied as to Defendant Patrolman London only.

## V.    CONCLUSION

The Court, having reviewed the parties' contentions, rules that summary judgment is DENIED as to Plaintiff's cause of action against Patrolman Mensch for excessive force and common law assault.  Summary judgment is also DENIED as to Plaintiff's cause of action for unlawful search against Patrolman London.[17],[18]

---

Cir. 2012)("We read *Farrar* [v. Hubbs, 506 U.S. 103 (1992)] to grant district courts substantial discretion to decide whether no fee or some fee would be reasonable, as long as they acknowledge that a nominal damages award is presumptively a technical victory that does not merit an award of attorney's fees"); Carroll v. Clifford Twp., 625 F. App'x 43, 46 (3d Cir. 2015)(holding the district court's denial of attorney's fees was proper for a prevailing plaintiff awarded nominal damages under § 1983 because the court gave primary consideration to the disparity between damages awarded and the damages sought, and the damages awarded were a "minute fraction of those that were sought.")  It is evident to the Court from the Complaint through the briefing that Plaintiff has only anemically pursued such claim here and that fact may be relevant should Plaintiff prevail nominally.

[17] The Court additionally denies without prejudice Defendants' motion for summary judgment on the issue of punitive damages. (Defs.' Br. 39-40).  While the Court sees NO record evidence to support an award for punitive damages, and Plaintiff does not substantively oppose the motion, "the issue of punitive damages is generally a question of fact for the jury."  Elmiry v. Wachovia Corp., Civ. A. No. 04-3621 (PGS), 2007 WL 4117260, at *16 (D.N.J. Nov. 16, 2007) (quoting Fisher v. Volz, 496 F.2d 333, 347 (3d Cir. 1974)).  Defendants may request a revisiting of the issue at trial.

Finally, summary judgment in favor of Defendants is GRANTED as to Plaintiff's causes of action for common law assault, excessive force, and unlawful search and seizure. All other causes of action against all other Defendants are conceded.  An appropriate Order follows.


DATED: <u>June 5, 2017</u>

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

---

[18] The Court additionally denies Defendants' motion for summary judgment based on immunity for discretionary functions pursuant to N.J.S.A. § 59:3-2.  Defendants make only a very vague assertion of this immunity's application, which seems minimal. <u>See</u> <u>Tice v. Cramer</u>, 133 N.J. 347, 366 (1993) (noting that the immunity is intended to apply to "discretion exercised at the highest levels of government in matters of policy or planning" and that police officer's on-scene duties were "infinitely distant from high-level policy or planning decisions" and "to label this kind of determination by a public employee 'discretionary,' and therefore immune would end all public employee liability . . . ."); <u>see also</u> <u>Pucca v. City of Long Branch</u>, Civ. A. No. 12-4640 (FLW), 2015 WL 1346170, at *7 (D.N.J. Mar. 25, 2015) (citing <u>Tice</u> for this proposition).